**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7                    IN THE UNITED STATES DISTRICT COURT
8                    FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10   COALITION OF HUMAN ADVOCATES FOR          No. C-06-1887 MMC
     K9'S AND OWNERS,
11                                              **ORDER GRANTING IN PART AND**
                   Plaintiff,                   **DENYING IN PART DEFENDANTS'**
12                                              **MOTION TO DISMISS; VACATING**
         v.                                     **HEARING**
13
     CITY AND COUNTY OF SAN FRANCISCO,          (Docket No. 44)
14   et al.,
15                 Defendants.
16   _____/
17
18        Before the Court is the motion filed October 4, 2006 by defendants City and County

19   of San Francisco, Gavin Newsom in his capacity as the Mayor of the City and County of

20   San Francisco, Carl Friedman in his capacity as director of San Francisco Animal Care and

21   Control, and San Francisco Animal and Control, seeking dismissal of the instant action for

22   lack of standing and failure to state a claim, pursuant to Rules 12(b)(1) and 12(b)(6) of the

23   Federal Rules of Civil Procedure.  Plaintiff Coalition of Human Advocates for K9's &

24   Owners ("CHAKO") has filed opposition to the motion; defendants have filed a reply.

25   Having considered the papers filed in support of and in opposition to the motion, the Court

26   finds the matter appropriate for decision without oral argument, see Civil L.R. 7-1(b),

27   VACATES the March 2, 2007 hearing,[1] and rules as follows.

28   _____

          [1] The hearing date on the instant motion was continued twice, the first time at
     plaintiff's request, and the second time pursuant to the parties' stipulation.

1

**BACKGROUND**

2      The instant action challenges the legality of San Francisco Ordinance No. 268-05

3  ("Ordinance"), which added sections to the San Francisco Health Code prohibiting the

4  ownership of unsterilized pit bulls, subject to certain exceptions, but with no exception for

5  pit bull service dogs.  See First Amended Complaint ("FAC") ¶¶ 18-19 (citing San Francisco

6  Health Code §§ 43-44.7); see also Defendants' Request for Judicial Notice ("RJN") Ex. D

7  (Ordinance).  In particular, San Francisco Health Code § 43.1 provides:  "No person may

8  own, keep, or harbor any dog within the City and County of San Francisco that the person

9  in possession knew, or should have known, was a pit bull that has not been spayed or

10  neutered," subject to certain exceptions.  See San Francisco Health Code § 43.1.  The

11  itemized exceptions are: (1) the pit bull is under eight weeks of age; (2) the pit bull cannot

12  be spayed or neutered without a high likelihood of suffering serious bodily harm or death

13  due to a physical abnormality; (3) the pit bull has been present in San Francisco for a

14  period of less than thirty days; (4) the owner of the pit bull has submitted an application for

15  a breeding permit; (5) the owner has appealed the City's determination that the dog is a pit

16  bull; or (6) the pit bull is a registered show dog.  See id.

17      Plaintiff contends the Ordinance violates the following federal and state statutes:

18  (1) Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131 et seq., (2) § 504 of

19  the Rehabilitation Act, 29 U.S.C. §§ 794 et seq., (3) California Government Code § 11135,

20  (4) California Civil Code § 51 ("Unruh Act"), (5) California Civil Code § 54 ("Disabled

21  Persons Act"), and (6) California Food and Agriculture Code § 31683.  (See SAC ¶¶ 27-67,

22  100-105.)  Plaintiffs further allege the Ordinance is unconstitutional under the state and

23  federal constitutions on the grounds that it (1) violates Article 1 § 1 of the California

24  Constitution by unlawfully depriving Californians of their property interest in "intact dogs"

25  obtained prior to the implementation of the Ordinance; (2) is impermissibly vague in

26  violation of the Due Process Clause of the 14th Amendment to the United States

27  Constitution; (3) bears no rational relationship to a legitimate government interest and thus

28  violates the Equal Protection Clause of the 14th Amendment; and (4) adversely affects

2

1   interstate commerce in violation of the Commerce Clause of the United States Constitution.

2   (See id. ¶¶ 68-99.)

3                                    **LEGAL STANDARD**

4         A motion to dismiss under Rule 12(b)(6) cannot be granted unless "it appears

5   beyond doubt that the plaintiff can prove no set of facts in support of his claim which would

6   entitle him to relief." See Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  Dismissal can be

7   based on the lack of a cognizable legal theory or the absence of sufficient facts alleged

8   under a cognizable legal theory.  See Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699

9   (9th Cir. 1990).

10        Generally, a district court, in ruling on a Rule 12(b)(6) motion, may not consider any

11  material beyond the pleadings.  See Hal Roach Studios, Inc. v. Richard Feiner And Co.,

12  Inc., 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990).  Material that is properly submitted as part

13  of the complaint, however, may be considered.  See id.  Documents whose contents are

14  alleged in the complaint, and whose authenticity no party questions, but which are not

15  physically attached to the pleading, also may be considered.  See Branch v. Tunnell, 14

16  F.3d 449, 454 (9th Cir. 1994).  In addition, the Court may consider any document "the

17  authenticity of which is not contested, and upon which the plaintiff's complaint necessarily

18  relies," regardless of whether the document is referred to in the complaint.  See Parrino v.

19  FHP, Inc., 146 F.3d 699, 706 (9th Cir. 1998).  Finally, the Court may consider matters that

20  are subject to judicial notice.  See Mack v. South Bay Beer Distributors, Inc., 798 F.2d

21  1279, 1282 (9th Cir. 1986).

22        In analyzing a motion to dismiss, the Court must accept as true all material

23  allegations in the complaint, and construe them in the light most favorable to the

24  nonmoving party.  See NL Industries, Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).

25  The Court may disregard factual allegations if such allegations are contradicted by the facts

26  established by reference to exhibits attached to the complaint.  See Durning v. First Boston

27  Corp., 815 F.2d 1265, 1267 (9th Cir. 1987).  Conclusory allegations, unsupported by the

28  facts alleged, need not be accepted as true.  See Holden v. Hagopian, 978 F.2d 1115,

                                            3

1121 (9th Cir. 1992).  Courts are not required to "assume the truth of legal conclusions

merely because they are cast in the form of factual allegations."  See Warren v. Fox Family

Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003) (internal quotation and citation

omitted).

**DISCUSSION**

**A.  Disability Claims**

Defendants move to dismiss the first five causes of action ("Disability Claims") for

lack of standing and failure to state a claim.

In support of the Disability Claims, plaintiff alleges the Ordinance violates various

federal and state disability discrimination laws because the Ordinance discriminates against

"persons with disabilities who own and/or train service dogs or guide dogs" by failing to

exempt their dogs from the requirements of the Ordinance.  (See, e.g., Compl. ¶ 30.)

According to plaintiff, "[m]any service dogs, particularly but not exclusively male mobility

assistance dogs such as those required to pull manual wheelchairs, should remain intact

until after physical maturity, which can be as late as 3 or 4 years, depending on the breed,

in order to allow the dog to safely and effectively fulfill its duties"; "[d]ogs that are neutered

prior to physical maturity, especially as young as 8 weeks, could be unable to act as

mobility assistance dogs."  (See id. ¶ 32.)  According to plaintiff, the enactment of the

Ordinance unlawfully restricts (1) "the ability of persons with disabilities to train and/or own

service dogs suitable to the tasks needed," (2) "the ability of persons with disabilities who

own intact service dogs from moving to San Francisco with their service dogs," (3) "the

ability of a person with a disability [to] choos[e] the breed of dog best suited to perform the

tasks needed," and (4) "the ability of a person with a disability from enjoying the full and

equal privileges and benefits of citizenship in San Francisco" because disabled persons

who comply with the Ordinance are "without the assistance of their service dog while the

service dog is recuperating from its sterilization procedure."  (See id. ¶ 45.)

Thus, as defendants observe, plaintiff's Disability Claims "are based on the theory

that people with disabilities have a statutory right to use unsterilized pit bulls between the

4

1  ages of eight weeks and four years, as opposed to some other breed of dog, or as opposed

2  to a pit bull that has been sterilized." (See Motion at 9:9-10.)

3         **1. Standing**

4         Defendants' first argument in support of dismissal of the Disability Claims is that

5  plaintiff has failed to adequately allege standing. As defendants note, the burden is on

6  plaintiff "clearly to allege facts demonstrating that [it] is a proper party to invoke judicial

7  resolution of the dispute." See United States v. Hays, 515 U.S. 737, 743 (1995) (internal

8  quotations and citations omitted).

9         An association, such as plaintiff, "has standing to bring suit on behalf of its members

10 when: (a) its members would otherwise have standing to sue in their own right;[2] (b) the

11 interests it seeks to protect are germane to the organization's purpose; and (c) neither the

12 claim asserted nor the relief requested requires the participation of individual members in

13 the lawsuit." See Hunt v. Washington State Apple Advertising Commission, 432 U.S. at

14 343. The first two elements are constitutionally required, while the third element is merely

15 prudential in nature. See United Food and Commercial Workers Union Local 751 v. Brown

16 Group, Inc., 517 U.S. 544, 555-56 (1996).

17        Defendants contend plaintiff has failed to adequately plead the first and third

18 elements of the above-referenced test.[3]

19        **a. First Element**

20        A CHAKO member has standing to sue in his own right if (1) he has suffered an

21 "injury in fact" that is "concrete and particularized," and "actual or imminent, not conjectural

22 or hypothetical", (2) the injury is traceable to the challenged action of the defendant and not

23 the result of the independent action of a third party not before the Court, and (3) it is likely

24 _____

25        [2] "The association must allege that its members, or any one of them, are suffering
   immediate or threatened injury as a result of the challenged action[.]" See Hunt v.
26 Washington State Apple Advertising Commission, 432 U.S. 333, 342 (1977) (internal
   citation and quotation omitted).

27        [3] The Court granted defendants' prior motion to dismiss the Disability Claims for
   failure to adequately plead standing, with leave to amend. (See Order Granting
28 Defendants' Motion to Dismiss, filed August 16, 2006, ¶ 1.)

1   that the injury will be redressed by a favorable decision.  See Lujan v. Defenders of Wildlife,

2   504 U.S. 555, 561 (1992) (internal quotations and citations omitted).

3        Plaintiff alleges it "is a not-for-profit, unincorporated association doing business in

4   California, and has active members that are residents of the State of California," including

5   "owners of bull and terrier breeds (commonly referred to as 'Pit Bulls'), . . . [and] persons

6   with disabilities who own Pit Bull service dogs both in California and in other States, as well

7   as in San Francisco[.]"  (See FAC ¶ 5.)  Plaintiff further alleges it "has at least one member

8   living in San Francisco, who is a 'qualified individual with a disability,' and who requires

9   and/or has the assistance of an already-sterilized 'Pit Bull' service dog for mobility, for

10  assistance in leaving the home, to go about a daily routine of grocery shopping, attending

11  appointments, socializing outside the home, and generally those same activities, benefits,

12  and privileges enjoyed by non-disabled persons."  (See id. ¶ 35.)  As defendants observe,

13  such allegations are insufficient to allege standing, as persons who own or require "already-

14  sterilized" pit bulls are unaffected by the Ordinance.

15       Plaintiff further alleges, however, that it "has at least one member living in San

16  Francisco, who is a 'qualified individual with a disability,' and who requires and/or has the

17  assistance of an intact service dog that, although not a 'Pit Bull,' could be and is reasonably

18  likely to be confused or mistaken as either a 'Pit Bull' or 'Pit Bull'-mix subject to the ambit of

19  the . . . Ordinance[.]"  (See id. ¶ 36.)  This allegation suffices to establish that at least one

20  of CHAKO's members has suffered injury-in-fact sufficient to challenge the Ordinance;

21  plaintiff has adequately alleged that at least one of its disabled members is threatened with

22  injury by the Ordinance because he lives in San Francisco, has an intact service dog that is

23  likely to be found subject to the Ordinance,[4] and spaying or neutering the dog would result

24  in a period of recovery during which "the dog should be kept inactive and not perform its

25

26       [4] The Ordinance defines the term "pit bull" to include "any dog that is an American
    Pit Bull Terrier, American Staffordshire Terrier, Staffordshire Bull Terrier, or any dog
27  displaying the physical traits of any one or more of the above breeds, or any dog displaying
    those distinguishing characteristics that conform to the standards established by the
    American Kennel Club ('AKC') or United Kennel Club ('UKC') for any of the above breeds."
28  See San Francisco Health Code § 43(a) (emphasis added).

1    working functions."  (See id. ¶¶ 34, 36);[5] see also Warth v. Seldin, 422 U.S. 490, 511

2    (1975) (holding "association must allege that its members, or any one of them, are suffering

3    immediate or threatened injury as a result of the challenged action of the sort that would

4    make out a justiciable case had the members themselves brought suit") (emphasis added);

5    Arizona Right to Life Political Action Committee v. Bayless, 320 F.3d 1002, 1006 (9th Cir.

6    2003) (holding injury-in-fact requirement satisfied where plaintiff has "a realistic danger of

7    sustaining a direct injury as a result of the statute's operation or enforcement"; noting

8    plaintiff "does not have to await the consummation of threatened injury to obtain preventive

9    relief").

10         Plaintiff further alleges that "[a]t least one of Plaintiff's disabled member's 'Pit Bull'

11   service dog has reached an age where it is no longer able to effectively perform its working

12   functions"; if that person "elects to obtain a younger, intact 'Pit Bull' service dog, which

13   Plaintiff's disabled member wants to do and which Plaintiff contends is its disabled

14   members' right to do under the ADA, Plaintiff's disabled members will be forced to either

15   violate the . . . Ordinance or comply with the . . . Ordinance and risk being without the

16   assistance of their 'Pit Bull' service dog for a period as long as 10 days or risk the death of

17   the service dog."  (See id. ¶ 37.)  Although there is no allegation that the above-referenced

18   CHAKO member resides in San Francisco, plaintiff identifies that person as Turanesha

19   Berry ("Berry"), and Berry attests that she resides in San Francisco.  (See RJN Ex. F (Berry

20   Decl.) ¶ 2.)  With that clarification, plaintiff has adequately alleged that at least one of its

21   disabled members, Berry, is threatened with injury by the Ordinance because she lives in

22   San Francisco, wishes to obtain an intact pit bull service dog, and cannot do so without

23   violating the Ordinance.  (See id. ¶ 37); see also Warth v. Seldin, 422 U.S. at 511; Arizona

24   Right to Life Political Action Committee v. Bayless, 320 F.3d at 1006.

25         Accordingly, CHAKO has established the first element of the test for associational

26   _____

27        [5] As discussed infra, however, there is no allegation as to the age or sex of said
     member's dog and, consequently, to the extent plaintiff additionally seeks to base its
28   Disability Claims on the adverse effect of neutering dogs of a certain age, plaintiff lacks
     standing to do so.

1   standing.[6]

2   **b.  Second Element**

3   As noted, defendants do not argue that CHAKO has failed to adequately allege the

4   second element of the test for associational standing.

5   **c.  Third Element**

6   Defendants further argue that plaintiffs have not adequately demonstrated the third

7   element of the test for associational standing, specifically, that "neither the claim asserted

8   nor the relief requested requires the participation of individual members in the lawsuit."

9   See Hunt, 432 U.S. at 343.  Defendants contend that adjudicating the Disability Claims

10  would necessitate a fact-intensive individualized inquiry because "whether an individual

11  with a disability has the statutory right to an unsterilized pit bull between the ages of eight

12  weeks and four years will depend on the nature of her mobility restriction, the type of

13  assistance she needs from her service animal, whether sterilization will interfere with the

14  ability of her pit bull to perform specific services, and, most significantly, whether there is a

15  reasonable alternative to the use of an unsterilized pit bull given the particular member's

16  individual needs."  (See Motion at 13:17-22.)

17  Defendants fail to demonstrate, however, why such an individualized inquiry is

18  necessary, as a matter of law, to adjudicate plaintiffs' claims for injunctive relief.  The

19  Supreme Court has recognized that "whether an association has standing to invoke the

20  court's remedial powers on behalf of its members depends in substantial measure on the

21  nature of the relief sought."  See Warth, 422 U.S. at 515.  Where an "association seeks a

22  declaration, injunction, or some other form of prospective relief, it can reasonably be

23  supposed that the remedy, if granted, would inure to the benefit of those members of the

24  association actually injured."  See id.  Where an association seeks damages on behalf of its

25  members, however, the damages claims may not be common to the entire membership, or

26  
_____

27      [6] There is no argument that any injury suffered by CHAKO's members is not
    traceable to actions of the defendants or that it is not likely that such injury will be
28  redressed by a favorable decision.  See Lujan, 504 U.S. at 561.

8

shared equally by all members and, thus, "both the fact and extent of injury [may] require individualized proof."  See id. at 515-16.  Thus, "'individual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members" but is "required in an action for damages to an association's members."  See United Food, 517 U.S. at 546.  Here, plaintiffs do not assert any claims for damages.

Defendants concede they are "aware of no Ninth Circuit decision involving injunctive relief that has explored the level of 'individualized inquiry' that would require denial of associational standing," and acknowledge that "[i]n three cases, the Ninth Circuit allowed associational standing in large part because the association was seeking injunctive relief (and not damages) on behalf of its individual members[.]"  (See Motion at 13 n.8 (citing Columbia Basin Apartment Association v. City of Pasco, 268 F.3d 791, 799 (9th Cir. 2001) (holding, in suit for injunctive and declaratory relief challenging constitutionality of city ordinance, third prong of test for associational standing satisfied because such "forms of relief do not require individualized proof"); Associated General Contractors of California, Inc. v. Coalition for Economic Equity, 950 F.2d 1401, 1408 (9th Cir. 1991) (holding association's suit for declaratory and injunctive relief challenging constitutionality of city ordinance did not require individualized proof by association's members); and Alaska Fish and Wildlife Federation and Outdoor Council, Inc. v. Dunkle, 829 F.2d 933, 937-38 (9th Cir. 1987) (holding third prong of test for associational standing satisfied in suit challenging legality of "cooperative agreements" relating to the hunting of migratory birds because, in light of association's request for "declaratory and prospective relief rather than money damages, its members need not participate directly in the litigation")).

Defendants rely instead on out-of-circuit cases, and, in particular, Pharmaceutical Care Management Association v. Rowe, 429 F.3d 294 (1st Cir. 2005).  In Rowe, the plaintiff association sought an injunction precluding enforcement of a statute on the ground that it "violate[d] the Takings Clause of the Fifth Amendment because it condition[ed] doing business in Maine upon the forced disclosure or taking of proprietary information."  See id. at 299.  The First Circuit found the association lacked standing to assert such claim on

9

behalf of its members because there "appear[ed] to be considerable variation in each
member company's particular circumstances" as to "whether a member already disclose[d]
the information in question." See id. at 314.  As defendants note, several out-of-circuit
district court cases also have found a lack of associational standing where the associations
therein sought injunctive relief in order to make various programs and facilities accessible
to their disabled members.  See Association for Disabled Americans, Inc. v. Concorde
Gaming Corp., 158 F. Supp. 2d 1353, 1363-64 (S.D. Fla. 2001) (citing Concerned Parents
to Save Dreher Park Center v. City of West Palm Beach, 884 F. Supp. 487, 488 (S.D. Fla.
1994)); Concerned Parents, 884 F. Supp. at 488-89 (holding "any finding of an ADA
violation requires proof as to each individual claimant" and "the relief afforded to each
claimant would require an individualized assessment of what measures the City must take
in order to comply with the ADA on a case-by-case basis").

      Such cases, however, are not controlling authority in the Ninth Circuit,[7] and, in any
event, are distinguishable.  In each of those cases, the very existence of an injury on the
part of any individual member of the association at issue therein could not be determined
without resort to individualized proof. Here, by contrast, there is at least one injury caused
by the Ordinance that is common to all disabled persons who have or wish to obtain an
intact pit bull service dog.  In particular, such persons cannot keep, or obtain and keep, an
intact pit bull service dog without violating the Ordinance.  (See FAC ¶¶ 32, 34.)

      Accordingly, the Court finds defendants have not demonstrated CHAKO has failed to
satisfy the third prong of the test for associational standing.

### d. Conclusion

      Accordingly, defendants' motion to dismiss the Disability Claims for lack of standing
will be denied.

---

[7] Indeed, the Ninth Circuit's decisions can be read as applying a blanket rule that
"injunctive and declaratory relief . . . do not require individualized proof."  See, e.g.,
Columbia Basin, 268 F.3d at 799; see also Associated General Contractors v. Metropolitan
Water District of Southern California, 159 F.3d 1178, 1181 (9th Cir. 1998) ("Individualized
proof from the members is not needed where, as here, declaratory and injunctive relief is
sought rather than monetary damages.").

1
## 2.  Failure to State a Claim

2        With respect to the merits of the Disability Claims, the parties agree that the

3   standard for determining whether the Ordinance unlawfully discriminates against disabled

4   persons is identical under each of the five statutes at issue, and have chosen to analyze

5   the Disability Claims by reference to decisions interpreting the ADA.

6        Under the ADA, "no qualified individual with a disability shall, by reason of such

7   disability, be excluded from participation in or be denied the benefits of the services,

8   programs, or activities of a public entity, or be subjected to discrimination by any such

9   entity."  See 42 U.S.C. § 12132.  In Crowder v. Kitagawa, 81 F.3d 1480 (9th Cir. 1996), a

10  class of visually-impaired persons who used guide dogs sought exemption from Hawaii's

11  imposition of a 120-day quarantine on carnivorous animals entering the state, arguing that

12  quarantine of their guide dogs violated the ADA.  See id. at 1481.  Hawaii law permitted

13  disabled persons seeking to bring a guide dog into the state to stay free of charge in an

14  apartment or cottage at the quarantine station for the duration of the 120-day quarantine

15  period.  See id. at 1482.  Hawaii also permitted the quarantined guide dog, after an initial

16  10-day observation period, to train with its owner on the quarantine station grounds, and to

17  train off the station grounds for up to four hours a day, three days per week, if accompanied

18  by a department inspector and subject to the restriction that the dog not have any contact

19  with other animals or humans.  See id.

20       In Crowder, the defendants argued there was no violation of the ADA because the

21  quarantine was a public health measure rather than a service or benefit furnished by the

22  state.  See id. at 1483.  The Ninth Circuit rejected the defendants' argument, observing that

23  "Congress intended to prohibit outright discrimination, as well as those forms of

24  discrimination which deny disabled persons public services disproportionately due to their

25  disability."  See id.  The Court further held:

26       Although Hawaii's quarantine requirement applies equally to all persons
         entering the state with a dog, its enforcement burdens visually-impaired
27       persons in a manner different and greater than it burdens others. Because of
         the unique dependence upon guide dogs among many of the visually-
28       impaired, Hawaii's quarantine effectively denies these persons – the plaintiffs

11

in this case – meaningful access to state services, programs, and activities while such services, programs, and activities remain open and easily accessible by others. The quarantine, therefore, discriminates against the plaintiffs by reason of their disability.

See id. at 1484.[8]

Here, defendants argue, the Disability Claims fail to state a claim because plaintiff fails to allege that disabled persons could not enjoy access to San Francisco's services and activities through the use of a service animal other than an intact pit bull service dog.  To the extent the Ordinance bars disabled persons from acquiring and thereafter keeping intact pit bull service dogs, defendants' argument is persuasive, as plaintiff does not allege that intact pit bull service dogs provide services that cannot be duplicated with another type of service animal.  Consequently, plaintiff has not stated a claim that a disabled person's inability to obtain an intact pit bull service dog "effectively denies" such persons "meaningful access to state services, programs, and activities while such services, programs, and activities remain open and easily accessible by others."  See Crowder, 81 F.3d at 1484.

The analysis is different with respect to disabled persons who already own an intact pit bull service dog.  Plaintiff alleges that "[d]ogs that are neutered prior to physical maturity, especially as young as 8 weeks, could be unable to act as mobility assistance dogs." (See FAC ¶ 32.)  With respect to disabled persons who currently use an intact pit bull service dog for mobility assistance, the Ordinance, as alleged, could impair the dog's effectiveness for such purposes, and, thus, "effectively den[y]" such persons "meaningful access to state services, programs, and activities" in violation of the ADA.  See Crowder, 81 F.3d at 1484.  As defendants point out, however, there is no allegation that any of plaintiff's members owns an intact pit bull service dog between the age of eight weeks and four years that is

_____

[8] Where a state policy discriminates against the disabled in violation of the ADA, Department of Justice regulations require "reasonable modifications . . . when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  See 28 C.F.R. § 35.130(b)(7).  The Ninth Circuit held, in Crowder, that "what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry," and remanded the action to the district court "for determination of the factual dispute whether the plaintiffs' proposed modifications to Hawaii's quarantine [were] reasonable under the ADA."  See id. at 1486.

1    used for mobility assistance.  Accordingly, to the extent plaintiff's Disability Claims are

2    based on the impaired utility of service dogs of such age, the claims are subject to

3    dismissal for lack of standing.

4         Plaintiff further alleges, however, that "the recovery time for a dog, following

5    sterilization, can be as long as ten days," and that "[d]uring that time, the dog should be

6    kept inactive and not perform its working functions, including many working functions that

7    assist disabled persons."  (See FAC ¶ 34.)  Reading such allegations in the light most

8    favorable to plaintiff, as the Court must do in ruling on a motion to dismiss, see N.L.

9    Industries, Inc. v. Kaplan, 792 F.2d at 898, the Court finds plaintiff, in effect, has pleaded

10   that any disabled person who is required to spay or neuter his/her intact service dog may

11   be deprived of that dog's assistance for a period of up to 10 days.

12        Defendants argue that the ADA does not prohibit isolated, temporary denials of

13   access.  The only authority defendants cite for this proposition, however, is a regulation

14   requiring public entities to "maintain in operable working condition those features of

15   facilities that are required to be readily accessible to and usable by persons with

16   disabilities" and further providing that "isolated or temporary interruptions in service due to

17   maintenance or repairs" are not prohibited.  See 28 C.F.R. § 35.133(b).  Defendants

18   concede such regulation was unlikely to have been drafted with the "maintenance or repair"

19   of pit bulls in mind.  Moreover, Crowder itself involved a temporary deprivation of access,

20   i.e., the 120-day quarantine at issue therein, and the Ninth Circuit expressed no concern

21   that the ADA did not apply to such temporary deprivations.  Although the 120-day

22   quarantine period at issue in Crowder is longer than the maximum 10-day recovery period

23   alleged in the instant action, the Ninth Circuit, in Crowder, also expressed concerns about

24   deprivations lasting only a few days.  See Crowder, 81 F.3d at 1484-85.  In particular, the

25   Ninth Circuit found that "[d]uring the four days of each week of the quarantine period when

26   guide dogs must remain in the quarantine station," the denial of meaningful access "is

27   particularly acute" and observed that "[i]t is no response to assert that the visually-impaired,

28   like anyone else, can leave their dogs in quarantine and enjoy the public services they

13

desire." <u>See id.</u>; <u>see also</u> <u>Heather K. v. City of Mallard, Iowa</u>, 946 F. Supp. 1373, 1386-87,

1389 (N.D. Iowa 1996) (finding triable issue under ADA as to whether ordinance permitting

backyard burning of yard waste 18 days per year violated rights of person with respiratory

problems).  Accordingly, the Court finds the fact that disabled persons who are required to

spay or neuter their pit bull service dogs may be deprived of the assistance of their service

animals only for a one-time period of ten days does not bring their claim outside the scope

of the ADA.

In sum, defendants' motion to dismiss the Disability Claims will be granted to the

extent plaintiff contends the Ordinance discriminates against disabled persons by

preventing them from acquiring and thereafter keeping intact pit bull service dogs or by

impairing the utility of pre-existing pit bull service dogs used for mobility assistance.  The

motion will be denied to the extent plaintiff alleges the Ordinance discriminates against

disabled persons who currently own intact pit bull service dogs, by depriving such persons

of the use of their service dogs while the dog recovers from sterilization surgery.[9]

## B.  Article I, § 1, of the California Constitution

Defendants next move to dismiss plaintiff's sixth cause of action, by which plaintiff

claims the Ordinance violates Article I, § 1, of the California Constitution, which sets forth,

<u>inter alia</u>, the "inalienable rights" of "acquiring, possessing, and protecting property."  <u>See</u>

Cal. Const. Art. I, § 1.  Plaintiff alleges the Ordinance violates Article I, § 1, by "mandating

the sterilization of dogs on a breed-specific basis, without exempting service dogs or dogs

that were purchased, transferred, or acquired prior to the ordinance's implementation,

therein depriving California show and working dog owners of their property interests in their

canines because sterilized dogs may not be shown in UKC, AKC, or ADBA conformation

events, may not be bred, and may not participate in some working events implemented to

---

[9] Defendants additionally argue, in a footnote, that one of the Disability Claims, plaintiff's cause of action for violation of the Unruh Act, is subject to dismissal because public entities are not "business establishments" within the meaning of the Unruh Act, but contend the Court need not reach the issue because the Disability Claims are subject to dismissal for lack of standing and failure to state a claim.  (<u>See</u> Motion at 18 n.11.)  In light of the brevity of the parties' briefing on this issue, the Court does not address it herein.

1   ensure the continued viability and improvement of participating breeds."  (See FAC ¶ 71.)

2   Plaintiff further alleges that owners who obtained such animals prior to enactment of the

3   Ordinance "will be deprived of their property interests in such dogs or pay an excessive fee

4   to keep such dogs intact."[10]  (See FAC ¶ 72.)

5        Defendants argue plaintiff's California Constitution claim is subject to dismissal

6   because "courts have long rejected as 'obviously unsound' the contention that taxes or fees

7   violate this constitutional provision."  (See Motion at 19:7-8 (quoting Douglas Aircraft Co. v.

8   State, 13 Cal. 2d 545, 554 (1939)).  Plaintiff responds that defendants' argument "misses

9   the mark," for the reason that the "thrust of the 6th cause of action is that the ordinance

10  imposes a mandatory sterilization requirement on individuals who already own pit bulls or

11  pit bull mixes" and such requirement "impairs the value of these individuals' property

12  interests in such dogs because, at least with respect to individuals who own pure breeds,

13  [sterilized] pure breeds of dogs cannot be shown in UKC, AKC, or ADBA conformation

14  events."  (See Opp. at 21:4-7; FAC ¶ 71.)  Plaintiff concedes that the Ordinance "can be

15  applied prospectively and not violate Article I, Section 1," but argues that "the Ordinance

16  cannot be applied retrospectively against individuals who had already perfected a property

17  interest in intact pit bulls before the enactment" of the Ordinance.  (See Opp. at 22:6-9.)  In

18  short, plaintiff's claim is that the Ordinance's sterilization requirement unconstitutionally

19  reduces the value of intact pit bull show dogs owned prior to the enactment of the

20  Ordinance.  (See id. at 21:9-11.)

21       As noted, however, the Ordinance does not require that all pit bull show dogs be

22  spayed or neutered.  See San Francisco Health Code §§ 44, 44.1.  Rather, owners of such

23  dogs may obtain a breeding permit upon, inter alia, the payment of a $100 fee.  See San

24  Francisco Health Code § 44.1(a)(5).  In Douglas, the California Supreme Court rejected as

25  "obviously unsound" the argument that a tax on the use of "tangible personal property"

26  _____

27       [10] The Ordinance permits a dog owner to obtain a breeding permit for a pit bull if,
    inter alia, the dog has appeared in at least one dog show in the previous 365 days and the
28  owner pays a $100 fee.  See San Francisco Health Code §§ 43, 43.1.

1   violated Article I, § 1, holding § 1 "no more prohibits a tax on the privilege of use than it

2   does a tax on the property itself."  See Douglas, 13 Cal. 2d at 554.  The tax at issue in

3   Douglas applied only to property obtained after the enactment of the statute, however.  See

4   Douglas, 13 Cal. 2d at 548-49.  Consequently, Douglas does not address whether such a

5   tax could, consistent with Article I, § 1, be imposed on property obtained prior to enactment

6   of the tax.

7       In that regard, plaintiff cites People v. Davenport, 21 Cal. App. 2d 292 (1937).  In

8   Davenport, the California Court of Appeal overturned a criminal conviction where the

9   defendant was charged with "having purchased a security for the purpose of reselling it

10  without having first obtained a broker's license," on the ground that any statutory

11  requirement that "requires an individual to secure a broker's license before selling

12  securities which he has purchased and owns himself . . . would be unconstitutional" under

13  Article I, § 1.  See id. at 295.  The Davenport court held that a person's right of "acquiring,

14  possessing, and protecting property" under Article I, § 1, "'includes the right to dispose of

15  such property in such innocent manner as he pleases, and to sell it for such price as he can

16  obtain[.]'"  See Davenport, 21 Cal. App. 2 at 296 (quoting Ex Parte Quarg, 149 Cal. 79, 80

17  (1906)).  Davenport is distinguishable because, here, no restriction on the sale of personal

18  property is at issue.  To the extent Davenport can be read to hold that any taxation relating

19  to the use of personal property is unconstitutional, it has been overruled by Douglas.

20  Moreover, to the extent Davenport may be read to imply that any newly-imposed permit

21  requirement relating to the use of preexisting personal property is unconstitutional, any

22  such holding would be inconsistent with Nash v. City of Santa Monica; in Nash, the

23  California Supreme Court upheld the constitutionality, under Article I, § 1, of a city

24  ordinance requiring property owners to obtain a permit before removing rental units from

25  the housing market, as applied to a property owner who purchased the property at issue

26  prior to enactment of the ordinance.  See Nash v. City of Santa Monica, 37 Cal. 3d 97, 101,

27  103 (1984).  As the Supreme Court observed, "an ordinance restrictive of property use will

28  be upheld, against due process attack, unless its provisions are clearly arbitrary and

16

1  unreasonable, having no substantial relation to the public health, safety, morals, or general

2  welfare."  See id. (internal quotation and citation omitted).

3        The ordinance here at issue was enacted in response to the "mauling and killing of a

4  12 year old child in San Francisco by two pit bulls," and Mayor Newsom's subsequent

5  directive "to review and assess potential measures that the City could take to minimize the

6  chances of such attacks occurring in the future."  (See RJN Ex. A at 3.)  By prohibiting the

7  ownership of unsterilized pit bulls, the Ordinance is likely to reduce the number of pit bulls

8  and, consequently, the number of pit bull attacks, in San Francisco.  Such requirement, and

9  the Ordinance's exception for pit bull show dogs whose owners are willing to pay a $100

10  breeding permit fee, are not "clearly arbitrary and unreasonable, having no substantial

11  relation to the public health . . . or general welfare."  See Nash, 37 Cal. 3d at 103; see also

12  Katsaris v. Cook, 180 Cal. App. 3d 256, 264 n.3 (1986) ("It has long been the rule that the

13  police power of the state permits it to regulate, even to the point of death, the lives of

14  dogs.").

15        Accordingly, defendants' motion to dismiss plaintiff's claim that the Ordinance

16  violates Article I, § 1, of the California Constitution will be granted.

17        **C. Due Process Clause**

18        In its seventh cause of action, plaintiff alleges the Ordinance is "impermissibly

19  vague," in violation of the Due Process Clause to the Fourteenth Amendment of the United

20  States Constitution, because "it does not give notice to persons of reasonable intelligence

21  of what conduct is prohibited, and invites arbitrary and discriminatory enforcement."  (See

22  FAC ¶ 77.)  In particular, plaintiff alleges, the Ordinance's definition of "pit bull" to include

23  "any dog displaying a majority of physical traits of any one or more of the [American Pit Bull

24  Terrier, American Staffordshire Terrier, or Staffordshire Bull Terrier] breeds," see San

25  Francisco Health Code § 43(a), "is vague and will apply to many breeds that have no 'Pit

26  Bull' in their genetic heritage, including the  American Bulldog, Jack Russell Terriers,

27  Labrador Retrievers, Boxers, Bull Terriers, Rottweilers, and many other breeds" and, thus,

28  will "encompass several breeds of dogs never intended to be targeted by the ordinance and

17

1   subject residents to arbitrary, subjective and fundamentally unfair enforcement." (See FAC

2   ¶¶ 78, 82.)

3       Defendants move to dismiss plaintiff's Due Process claim on two grounds: lack of

4   associational standing and failure to state a claim.  With respect to standing, plaintiff, as

5   noted, alleges that one of its members "owns an unsterilized dog that, while not a 'Pit Bull,'

6   is of a breed that is likely to be mistakenly confused with a 'Pit Bull.'" (See FAC ¶ 85.)

7   Defendants contend the third element of the three-part Hunt test for associational standing

8   has not been met; specifically, according to defendants, such member's individual

9   participation is required to litigate whether the Ordinance is unconstitutionally vague.[11]  As

10  discussed above, however, because plaintiff seeks only injunctive and declaratory relief,

11  the individual participation of its members in this lawsuit is not required.  See, e.g.,

12  Columbia Basin, 268 F.3d at 799; Metropolitan Water District, 159 F.3d at 1181.

13  Accordingly, plaintiff's Due Process claim is not subject to dismissal for failure to

14  adequately allege standing.

15      Defendants' next argument, however, is persuasive, specifically, that plaintiff fails

16  to state a claim because plaintiff fails to allege the Ordinance is impermissibly vague as to

17  all types of dogs.  "[A] party challenging the facial validity of an ordinance on vagueness

18  grounds outside the domain of the First Amendment must demonstrate that the enactment

19  is impermissibly vague in all of its applications."  See Hotel & Motel Ass'n of Oakland v. City

20  of Oakland, 344 F.3d 959, 972 (9th Cir. 2003) (internal quotation and citation omitted).

21  Here, plaintiff does not allege that the Ordinance is vague in its application to all types of

22  dogs.

23  _____

24      [11] Defendants initially conceded that the first two elements of the three-part Hunt test
    for associational standing are satisfied by plaintiff's above-referenced allegation. (See
25  Motion at 20:6-8.)  In their reply, defendants endeavor to retract their concession as to the
    first element and now contend the first element has not been met because there is no
26  allegation of an actual or imminent injury.  As noted, however, the injury-in-fact requirement
    is satisfied where the plaintiff has "a realistic danger of sustaining a direct injury as a result
27  of the statute's operation or enforcement."  See Arizona Right to Life Political Action
    Committee v. Bayless, 320 F.3d at 1006.  Here, plaintiff adequately alleges that one of its
28  members owns an intact dog that, although not a pit bull, is likely to be deemed subject to
    the Ordinance.  (See FAC ¶ 36.)

1    In any event, given that the Ordinance, on its face, applies, inter alia, to "any dog

2  that is an American Pit Bull Terrier, American Staffordshire Terrier, [or] Staffordshire Bull

3  Terrier" and provides that the "AKC and UKC standards for [those] breeds are listed on

4  their websites as well as online through the Animal Care and Control Department's [ ]

5  website," see San Francisco Health Code § 43(a), it is difficult to imagine, at least with

6  respect to purebred specimens, how the breed could be identified more precisely in the

7  Ordinance.  Indeed, courts regularly have rejected vagueness challenges to ordinances, on

8  similar grounds, albeit based on an evidentiary record.  See, e.g., American Dog Owners

9  Ass'n v. Dade County, Florida, 728 F. Supp. 1533, 1541-42 (S.D. Fla. 1989) (rejecting

10  vagueness challenge to ordinance defining "pit bull" by reference to AKC and UKC

11  standards); Colorado Dog Fanciers, Inc. v. City and County of Denver, 820 P.2d 644, 650-

12  52 (Colo. 1991) (rejecting vagueness challenge to ordinance containing identical definition

13  of "pit bull" as instant ordinance); Greenwood v. City of North Salt Lake, 817 P.2d 816

14  (Utah 1991) (rejecting vagueness challenge to ordinance applicable to, inter alia, American

15  Staffordshire Terriers and Staffordshire Bull Terriers); State v. Anderson, 566 N.E. 2d 1224

16  (Ohio 1991) (rejecting vagueness challenge to ordinance applicable to "any dog that . . .

17  [b]elongs to a breed that is commonly known as a pit bull dog").[12]

18    Accordingly, as plaintiff fails to allege that the Ordinance is vague in its application to

19  all types of dogs, defendants' motion to dismiss plaintiff's claim that the Ordinance is

20  impermissibly vague in violation of due process will be granted.

21    **D.  Equal Protection**

22    In its eighth cause of action, plaintiff alleges the Ordinance violates the Equal

23  Protection Clause of the 14th Amendment to the United States Constitution because it

---

25  [12] Although the Massachusetts Supreme Court and Ohio Court of Appeals have found pit bull ordinances to be unconstitutionally vague, those cases are distinguishable because neither court attempted to determine whether the ordinance at issue was impermissibly vague in all of its applications, and, thus, did not apply the test for vagueness applicable in this Circuit.  See American Dog Owners Ass'n v. City of Lynn, 404 Mass. 73 (1989); City of Toledo v. Tellings, 2006 WL 513946 (Ohio App. March 3, 2006). Additionally, the Court notes that the Tellings opinion has been stayed and accepted for review by the Ohio Supreme Court.  See Toledo v. Tellings, 852 N.E.2d 186 (2006).

1    "bears no rational relationship to a legitimate government interest[.]"  (See FAC ¶ 87.)

2    Defendants move to dismiss plaintiff's equal protection claim; plaintiff offers no argument in

3    opposition.

4        "In areas of social and economic policy, a statutory classification that neither

5    proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld

6    against equal protection challenge if there is any reasonably conceivable state of facts that

7    could provide a rational basis for the classification."  See Federal Communications

8    Commission v. Beach Communications, Inc., 508 U.S. 307, 313 (1993).  There is no

9    contention here that pit bulls or pit bull owners constitute a suspect class or that there is

10   any fundamental constitutional right involved in the neutering or spaying of dogs.  Indeed,

11   the Supreme Court long ago held that "[e]ven if it were assumed that dogs are property in

12   the fullest sense of the word, they would still be subject to the police power of the state,

13   and might be destroyed or otherwise dealt with, as in the judgment of the legislature is

14   necessary for the protection of its citizens."  See Sentell v. New Orleans & C.R. Co., 166

15   U.S. 698 (1897).  Consequently, if "plausible reasons" exist for the enactment of the

16   Ordinance, the court's "inquiry is at an end."  See Federal Communications Commission v.

17   Beach Communications, Inc., 508 U.S. at 313-14 (internal quotations and citation omitted).

18   "[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of

19   legislative choices."  See id. at 313.

20       Here, as noted, the Ordinance was enacted in response to the "mauling and killing of

21   a 12 year old child in San Francisco by two pit bulls," and Mayor Newsom's subsequent

22   directive "to review and assess potential measures that the City could take to minimize the

23   chances of such attacks occurring in the future."  (See RJN Ex. A at 3.)  The city's decision

24   to require spaying and neutering of pit bulls as a means of reducing the number of pit bulls

25   and, consequently, the number of pit bull attacks on children cannot be said to be irrational.

26   Plaintiff sets forth no argument to the contrary.

27       Accordingly, defendants' motion to dismiss plaintiff's Equal Protection claim will be

28   granted.

1

**E.  Commerce Clause**

2    In its ninth cause of action, plaintiff alleges the Ordinance violates the Commerce

3    Clause of the United States Constitution because the Ordinance "substantially affects

4    interstate commerce in many ways."  (See FAC ¶ 99.)  In particular, plaintiff alleges, the

5    Ordinance (1) adversely impacts the ability of dog owners from outside California to accept

6    employment in San Francisco if they own a breed of dog subject to the Ordinance; (2)

7    adversely affects the ability of disabled persons who own service dogs subject to the

8    Ordinance to relocate to San Francisco; (3) adversely affects the ability of persons outside

9    California to travel to San Francisco with AKC or UKC show dogs in order to participate in

10    "canine events such as AKC conformation, agility and obedience events"; and (4) prohibits

11    owners of show dogs subject to the Ordinance from moving freely in interstate commerce

12    by relocating to San Francisco with their show dogs.  See id.  Defendants move to dismiss

13    plaintiff's commerce clause claim; plaintiff offers no argument in opposition.

14    The Supreme Court has held "that the Constitution's express grant to Congress of

15    the power to regulate Commerce among the several States contains a further, negative

16    command, known as the dormant Commerce Clause, that creates an area of trade free

17    from interference from the States."  See American Trucking Associations, Inc. v. Michigan

18    Public Service Commission, 545 U.S. 429, 433 (2005) (internal quotations and citations

19    omitted).  Local regulations of interstate commerce violate the dormant Commerce Clause

20    if they "unjustifiably discriminate on their face against out-of-state entities," or "impose

21    burdens on interstate trade that are clearly excessive in relation to the putative local

22    benefits."  See id. (internal quotation and citations omitted).  As defendants point out, the

23    Ordinance does not discriminate on its face against out-of-state entities, and imposes no

24    burden on interstate trade; the Ordinance merely prohibits the ownership of unsterilized pit

25    bulls in San Francisco if they are not used for breeding and/or for show.  See San

26    Francisco Health Code § 43.1.  Plaintiff submits no argument to the contrary.

27    Additionally, local jurisdictions "may not impose taxes that facially discriminate

28    against interstate businesses and offer commercial advantage to local enterprises," that

21

1  "improperly apportion state assessments on transactions with out-of-state components," or

2  that "have the inevitable effect of threatening the free movement of commerce by placing a

3  financial barrier around the State."  <u>See id</u>.  Here, the Ordinance's imposition of a $100 fee

4  for a pit bull breeding permit does not discriminate against interstate businesses; it does not

5  address out-of-state transactions in any manner; nor can it be said to threaten the free

6  movement of commerce by placing a financial barrier around the State.  As the Supreme

7  Court observed in upholding a $100 fee imposed on trucks engaged in intrastate

8  commercial hauling: "Nothing in our case law suggests that such a neutral, locally focused

9  fee or tax is inconsistent with the dormant Commerce Clause."  <u>See id</u>. at 434.  Plaintiff

10  submits no argument to the contrary.

11      Accordingly, defendants' motion to dismiss plaintiff's Commerce Clause claim will be

12  granted.

13      **F.  Section 31683**

14      Plaintiff's tenth and final cause of action alleges that "San Francisco has

15  implemented a policy that makes adoptions of 'Pit Bulls' from San Francisco's shelters

16  more difficult for members of the public than for other breeds," in violation of California

17  Food and Agriculture Code § 31683.[13]  (<u>See</u> FAC ¶¶ 102-103.)  Such claim does not make

18  reference to the Ordinance and does not appear to be based thereon.  Defendants move to

19  dismiss on the ground plaintiff fails to adequately plead associational standing; plaintiff

20  offers no argument in opposition.

21      As defendants point out, there is no allegation in the complaint that plaintiff has any

22  members who are affected by the alleged adoption policy.  Consequently, plaintiff has not

23  alleged the first element of the <u>Hunt</u> test for associational standing, which requires that an

24  _____

25     [13] Section 31683 states, in relevant part: "Except as provided in Section 122331 of
the Health and Safety Code, no program regulating any dog shall be specific as to breed."

26  <u>See</u> Cal. Food & Agr. Code § 31683.  Section 122331 authorizes cities and counties to
"enact dog breed-specific ordinances pertaining only to mandatory spay or neuter programs

27  and breeding requirements, provided that no specific dog breed, or mixed dog breed, shall
be declared potentially dangerous or vicious under those ordinances."  <u>See</u> Cal. Health &

28  Safety Code § 122331.

1   association's members "have standing to sue in their own right."  See Hunt, 432 U.S. at

2   343.  Plaintiff submits no argument to the contrary and does not contend that it could

3   successfully amend the complaint to address this deficiency.

4           Accordingly, defendants' motion to dismiss plaintiff's claim for violation of § 31683

5   will be granted.

6                                              **CONCLUSION**

7           For the reasons set forth above, defendants' motion to dismiss is GRANTED in part

8   and DENIED in part, as follows:

9           1. With respect to the Disability Claims:

10                  (a)  To the extent plaintiff contends the Ordinance discriminates against

11   disabled persons by preventing them from acquiring and thereafter keeping intact pit bull

12   service dogs and/or by impairing the utility of pre-existing pit bull service dogs used for

13   mobility assistance, the motion is hereby GRANTED with leave to amend;

14                  (b) To the extent plaintiff alleges the Ordinance discriminates against disabled

15   persons who currently own intact pit bull service dogs, by depriving such persons of the use

16   of their service dogs while the dogs recover from sterilization surgery, the motion is hereby

17   DENIED.

18           2.  With respect to the remainder of plaintiff's claims, the motion is hereby

19   GRANTED without leave to amend.

20           3.  Plaintiff's amended complaint, if any, shall be filed no later than March 16, 2007.

21   This order terminates Docket No. 44.

22           **IT IS SO ORDERED.**

23   
     Dated: February 27, 2007                      MAXINE M. CHESNEY
24                                                  United States District Judge

25

26

27

28

                                                    23